IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 11-40065-06/07-JAR |
| | ) | |
| ANGELA LOPEZ and, | ) | |
| ADRIENNE LOPEZ, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendant Adrienne Lopez's Motion to Suppress Evidence Regarding Car Stop, Drug Dog Search, and Statements (Doc. 74) and Defendant Angela Marie Lopez's Motion to Suppress Evidence (Doc. 70). The Court held an evidentiary hearing on February 11, 2014, where it took the motions under advisement. Having reviewed the briefs, evidence, and arguments presented by the parties, the Court is now prepared to rule. As described more fully below, the Court denies Defendants' motions.

**I.     FACTS**

Kansas Highway Patrol ("KHP") Trooper Robert Krause was patrolling US Highway 54 in Seward County, Kansas when he stopped an eastbound vehicle for driving 79 mph in a 65 mph zone. The vehicle was rental car that displayed California license plates. The driver was identified as Angela Marie Lopez of El Monte, California and the passenger was identified as Adrienne Lopez of Pico Rivera, California. Trooper Krause told the two women that he stopped them for speeding. He requested Angela's driver's license, proof of insurance and rental agreement. Angela told Trooper Krause that she lost her license; and she handed him a

"printout" from the California Department of Motor Vehicles, and her social security card. Trooper Krause testified that the printout was not a temporary license and did not provide photographic identification. The printout did identify the expiration date of Angela's driver's license, and her date of birth.

Adrienne also volunteered to give Trooper Krause her identification but he declined her offer at that time. Trooper Krause asked the two women about their travel origination and destination. Adrienne responded that they were headed to Kansas City or Nebraska to pick up their sister who was being abused by her boyfriend. Adrienne could not confirm the city where her sister was located. Trooper Krause asked if they had any drugs in the car. Both women denied having drugs, but Adrienne remarked, "I need some marijuana because this ride is taking too damn long."

Trooper Krause then asked if they had stopped anywhere to sleep. The rental paperwork provided by Angela showed that they had rented the car the day before at 5:30p.m. in El Monte California and that it was due back in less than 24 hours. Adrienne responded that they had picked up the car at 6:00p.m. the night before but had not spent the night anywhere. They had, however, stopped several times to eat and get fuel.

Trooper Krause returned to his patrol vehicle to run a check on Angela's license. The KHP dispatcher responded that Angela had no warrants and that her license was valid.

Trooper Krause issued Angela a written warning for speeding and not having her driver's license in her possession. Trooper Krause wished them a safe trip and began to walk away from their rental car. At this point, about twelve minutes had passed from the initial stop to this point. Angela turned on the right turn signal, signifying her readiness and intent to drive away. As

Trooper Krause reached the trunk area of their rental car, he did a 180-degree turn and re-approached their car, asking the two women if they would answer a few more questions. They agreed.

Trooper Krause again asked where they were headed. Adrienne responded that she could not confirm the city because she had been without cell phone service for nearly two hours and unable to contact her sister. Trooper Krause asked when they had rented the car. Angela replied that they rented the car the day before. Trooper Krause asked how they were related. Adrienne responded that they called each other cousins because they have known each other a long time and refer to themselves as the "A Lo's" because both of their first names start with "A" and their last names are Lopez.

Trooper Krause then requested to search the vehicle. Adrienne responded that they were given the right to go earlier, that they were tired, had not showered, and were in a rush. Trooper Krause again asked to search, explaining that a lot of drugs are transported on that highway in rental cars. Angela denied consent to search. Trooper Krause then asked if they would wait for him to inquire about the availability of a drug canine and Angela responded that she agreed to wait.

Trooper Krause returned to his car and requested that the dispatcher send a canine from Liberal, Kansas. The dispatcher responded that the canine would arrive in approximately twenty minutes. Trooper Krause returned to the women's car, and advised them of the canine's estimated arrival time. At this point, Trooper Krause requested Adrienne Lopez's identification; she provided him with a California state identification card and he returned to his car to check on her status. The dispatcher reported that Adrienne had four prior arrests for controlled substance

offenses in 2005, 2006, and 2007.  Trooper Krause returned to the women's vehicle, and gave Adrienne her identification card.  When Angela again asked if they were free to go, Trooper Krause indicated not, telling her to turn off the car engine.

Approximately thirty minutes after Trooper Krause requested a drug canine,.Officer Chris Head of the Liberal Police Department arrived on the scene with his canine, Rex.  Trooper Krause had the two women exit their vehicle.   As they exited, the women left the passenger side window rolled down.  Officer Head, inspected the women's car to ensure that there were no sharp or dangerous objects that could injure Rex.  During Officer Head's inspection, he did not enter the car or open any doors or windows.

Officer Head testified that when he gave Rex the command to sniff the vehicle, Officer Head was standing about eight feet away, near the back of the vehicle.  Officer Head did not escort nor accompany Rex during Rex's sniff of the vehicle.  Rex started his sniff at the driver's side of the vehicle and then continued around to the passenger's side.

Rex alerted at the passenger's side and proceeded to jump through the passenger window without any direction from Officer Head.  Officer Head explained that Rex typically "alerted," or showed that he smelled the presence of drugs but had not located the source, by jumping on his hind legs.  Once inside the vehicle, Rex indicated by sitting on the passenger's seat and focusing on Adrienne's purse.  Officer Head explained that  Rex typically "indicated," or showed that he found drugs, by sitting or laying down and placing his nose as closely as possible to the scent of the drugs. After Rex indicated on the purse, Officer Head opened the passenger door to allow Rex to exit the vehicle.  Officer Head next commanded Rex to search the vehicle a second time; this time Officer Heard walked around the car with Rex.  Rex again, indicated on the purse,

4

without any commands or signaling from Officer Head.

Once Rex gave a positive indication on the purse, Trooper Krause informed the two women that he intended to search the entire vehicle. Adrienne admitted to Trooper Krause that she had a small amount of marijuana in her purse. When Trooper Krause searched the purse, he found marijuana in a container labeled "Blueberry Kush." Trooper Krause's search of the interior of the vehicle yielded a 28-quart Coleman cooler in the rear seat area, which contained four vacuum sealed bags, which Trooper Krause believed to be illegal drugs. Trooper Krause field tested of the substance in the bags and received a positive result for methamphetamine. The substances were later tested by the DEA laboratory, and determined to be nearly two kilograms of 100% pure methamphetamine. About fifty minutes passed from the start of the traffic stop until the point that the canine and then Officer Head completed a search of the car.

## II. DISCUSSION

### A. STANDING

The Government contends that Adrienne lacks standing to challenge the search of the car because she was not the owner, driver, and was not on the rental agreement. Fourth Amendment rights are personal and cannot be claimed vicariously.[1] "It is immaterial if evidence sought to be introduced against a defendant was obtained in violation of someone else's Fourth Amendment rights."[2] Standing therefore "turns on the classic Fourth Amendment test: whether society is prepared to recognize [a particular] expectation as objectively reasonable."[3] It is well

---

[1] *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978).

[2] *United States v. Rascon*, 922 F.2d 584, 586 (10th Cir. 1990).

[3] *United States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2000).

established that passengers have no reasonable expectation of privacy in a vehicle when the passenger neither asserts a proprietary or possessory interest in either the vehicle or its contents.[4] However, it is recognized that persons do not shed their individual interests in being free from unlawful seizures merely because they are traveling as passengers in automobiles.[5]

Because Adrienne offered no evidence of her ownership or possessory interest in the vehicle, she failed to show that she had an objectively reasonable expectation of privacy in the car. Thus, she may not directly challenge the search of the car. Rather, Adrienne may challenge her detention. She would also have standing to challenge the evidence obtained from the car search if it was the fruit of an unlawful arrest.[6] But, as described more fully below, Adrienne was not unlawfully arrested. Therefore, only Angela, as the driver and renter of the vehicle, has standing to challenge the search of the vehicle.

B.   INITIAL STOP

Under the Fourth Amendment, a traffic stop is a "seizure" which is reasonable only if (1) the officer's action was "justified at its inception," and (2) the detention was "reasonably related in scope to the circumstances which justified the interference in the first place."[7] In *Arizona v. Johnson*,[8] the Supreme Court explained that "the first *Terry* condition—a lawful investigatory stop—is met whenever it is lawful for police to detain an automobile and its occupants pending

---

[4]*Rakas*, 439 U.S. at 148.

[5]*See United States v. Eylicio-Montoya,* 70 F.3d 1158, 1163 (10th Cir. 1995).

[6]*Id.* at 1164; *United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001) (examining factual nexus requirement between a passenger's detention and the vehicle search).

[7]*Terry v. Ohio*, 392 U.S. 1, 19-20 (1968).

[8]555 U.S. 323, 327 (2009).

inquiry into a vehicular violation," and the police need not believe the vehicle is involved in criminal activity.[9] "A traffic stop is justified at its inception if an officer has (1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that a particular motorist has violated any of the traffic or equipment regulations of the jurisdiction."[10] The officer's subjective motives are irrelevant and the Court examines only whether the stop was objectively justified.[11] Reasonable suspicion may be supported by an "objectively reasonable" good faith belief even if premised on factual error.[12] Furthermore, "reasonable suspicion may rely on information less reliable than that required to show probable cause . . . and it need not be correct."[13]

It is undisputed that Trooper Krause had a reasonable suspicion to stop the car, for the car exceeded the speed limit by fourteen mph, in violation of K.S.A. § 8–1560. Defendants offer no argument against the reasonable suspicion supporting Trooper Krause's initial stop. After the stop, Angela's failure to produce a valid driver's license violated another traffic law, K.S.A. § 8–244, which requires that a driver produce a valid driver's license to an officer upon request. .

### C. SCOPE AND DURATION OF DETENTION

Defendants challenge their detention as exceeding the permissible scope and duration of the initial traffic stop, in violation of the Fourth Amendment. Even if the initial stop of defendant's vehicle was legitimate, the detention must be "reasonably related in scope to the

---

[9]*Id.*

[10]*United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009).

[11]*United States v. White*, 584 F.3d 935, 945 (10th Cir. 2009).

[12]*United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004).

[13]*Id.* (internal citations omitted).

circumstances which justified the interference in the first place."[14]  "Generally, an investigative detention must last no longer than is necessary to effectuate the purpose of the stop."[15]  However, in the course of a routine traffic stop, an officer "may request vehicle registration and a driver's license, run a computer check, ask about travel plans and vehicle ownership, and issue a citation."[16]  An officer may also run a simultaneous check of the detainees' criminal history.[17]

Thereafter, "when a driver has produced a valid license and proof of entitlement to operate the vehicle, an officer may issue a citation, but then usually must allow the driver to proceed without further delay or questioning."[18]  "A stop generally ends when the officer returns the driver's license, registration, and insurance information."[19]

There is no evidence that the initial stop of Defendants was prolonged beyond what was necessary to effectuate the purpose of the stop.  Defendants do not dispute that Angela was speeding nor that she failed to produce a valid driver's license.  And, Trooper Krause's initial line of questioning about the women's travel plans was appropriate to determine whether Angela's driving might be impaired from exhaustion.  In the early minutes of the stop, Adrienne volunteered to give Trooper Krause her identification, but he declined the offer because at that point, his investigation was limited to Angela's traffic violation and possible impairment.

---

[14]*United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir. 2001); *United States v. Bustillos-Munoz*, 235 F.3d 505, 512 (10th Cir. 2000).

[15]*United States v. Cervine*, 347 F.3d 865, 870–71 (10th Cir. 2003) (internal quotation omitted); *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999).

[16]*United States v. Zubia-Melendez*, 263 F.3d 1155, 1161 (10th Cir. 2001).

[17]*United States v. McRae*, 81 F.3d 1528, 1535 n.6 (10th Cir. 1996).

[18]*Patten*, 183 F.3d at 1193 (citing *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998)).

[19]*See United States v. Werking*, 915 F.2d 1404, 1409 (10th Cir. 1990)).

8

Trooper Krause's request for Angela's driver's license and rental agreement were reasonably related to the circumstances justifying the stop—a speeding infraction. Once the dispatcher responded that Angela had no warrants and that she had a valid driver's license, Trooper Krause quickly completed the nonconsensual stop. He issued Angela a written warning, returned her documents, explained the traffic warnings, and wished the women a safe trip, indicating that they were free to go. At this point, only twelve minutes had expired between when Trooper Krause first stopped the car and when he wished the women a safe journey. The investigative detention terminated in a relatively brief period of time. Accordingly, the Court finds that the duration of the initial traffic stop was an appropriate amount of time and did not exceed the scope of investigating the traffic violations.

### D. CONSENSUAL ENCOUNTER

Defendants argue that even if the initial stop was valid, Trooper Krause's investigatory actions after returning the documents to Angela violated the Fourth Amendment as an unreasonable search and seizure, because at that point, the encounter was not consensual. A longer detention for additional questioning unrelated to the traffic stop is permissible under two circumstances: (1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring; or (2) the initial detention changes to a consensual encounter.[20] If an encounter between a police officer and a motorist is consensual, the Fourth Amendment ban on unreasonable searches and seizures does not come into play.[21]

Defendants urge that the encounter was not consensual because they refused consent to

---

[20]*United States v. Hunnicutt,* 135 F.3d 1345, 1349 (1998).

[21]*See United States v. Walker*, 933 F.2d 812, 817 (10th Cir. 1991).

search the vehicle and requested to leave the scene. But, there was an interim period of time between when the stop became a consensual encounter and before the women refused consent to search. First, Trooper Krause had returned Angela's documents and physically broke contact by walking away from the vehicle, signaling that they were free to continue their journey. Indeed, Angela engaged the turn signal as Trooper Krause walked away from the vehicle, demonstrating her awareness that she was free to leave. When Trooper Krause returned to the car, he asked, "You mind if I ask you a few more questions?" At this point, the two women consented to additional questioning, rendering the encounter consensual, for a reasonable person under these circumstances would believe that they were free to decline Trooper Krause's request to ask more questions.

Defendants argue that even if they did give consent, it was invalidated by a coercive show of authority. In determining whether consent was voluntarily given or coercively extracted, the court must look to whether a reasonable person would feel she was free to leave or disregard the officer's request when considering the totality of the circumstances.[22] The audio-video recording of the stop shows Trooper Krause aside their car, bent down with his arms to his side and his hands on his mid-thigh—not physically touching the car. His tone was conversational and there was no other indication that Trooper Krause made a coercive show of authority. Trooper Krause neither displayed his weapon, nor leaned on the car, nor touched the occupants. The Court finds that the audio-video recording supports Trooper Krause's testimony that he did not make a coercive show of authority.

    E.      **REASONABLE SUSPICION OF DEFENDANTS**

---

[22]*See United States v. Cardenas-Alatorre*, 485 F.3d 1111, 1118–19 (10th Cir. 2007).

After Trooper Krause questioned them about their travel plans, the rental of the car and how they were related, he asked if he could search their vehicle because drugs are frequently transported on that highway. Angela refused consent to search, and at that point, the encounter became nonconsensual.

Upon termination of the consensual encounter, an extended detention is lawful only if the officer had a reasonable and articulable suspicion of criminal activity.[23] The Court finds that Trooper Krause well articulated that he had reasonable suspicion to detain the two women, based on several factors: (1) the women could not confirm the state of their final destination, Nebraska or "Kansas City"; (2) Adrienne talked excessively for a passenger, an indication of her nervousness; (3) Angela had rented the vehicle for two days, an unreasonably short term given the distance of their trip; (4) it would have been nearly impossible for Angela to timely return the car; and (5) Adrienne urged Trooper Krause to avoid looking at the backseat because it was a "mess." Moreover, after running a check on her state identification card, Trooper Krause learned that Adrienne had four prior "controlled substance" offenses.

Defendants attempt to discount each of the individual factors. However, the factors are not to be examined individually.[24] The Supreme Court has stressed that the "totality of the circumstances" test "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"[25] Trooper Krause did not rely on one specific factor,

---

[23]*See United States v. Turner,* 928 F.2d 956, 959 (10th Cir. 1991).

[24]*United States v. Arvizu,* 534 U.S. 266, 271 (2002).

[25]*Id.* (quoting *United States v. Cortez,* 449 U.S. 411, 417-418 (2005)).

11

but many factors in his determination of reasonable suspicion. While under Defendants' analysis, any one of the trooper's factors may be explained away, the Court concludes that these factors when taken as a whole sufficiently caused the trooper to have a reasonable suspicion of criminal activity that justified a prolonged investigative detention.[26]

Defendants argue that they did not consent to their continued detention to await the arrival of the drug canine. Although Angela did not consent to Trooper Krause's search of the car, she did consent to waiting on the drug dog. And, when Trooper Krause informed the women of the canine's estimated arrival time—twenty minutes—Angela made no attempt to withdraw her consent. Nonetheless, the prolonged investigative detention was proper. Use of a drug dog to walk around the exterior of a defendant's car does not implicate legitimate privacy interests protected by the Fourth Amendment.[27] Where a motorist does not consent to a prolonged encounter, "an officer may nonetheless extend a detention when he or she observes specific and articulable facts supporting a reasonable suspicion that the driver is engaged in illegal activity."[28] Thus, consent is not required for a dog sniff of a lawfully detained vehicle.[29]

As stated above, Trooper Krause had reasonable suspicion of criminal activity to detain the women at the time they denied consent for Trooper Krause to search the car. Adrienne even remarked that she needed some marijuana because the ride was taking so long. Their consent was not required and the Court finds that Trooper Krause was able to rely on reasonable

---

[26]*United States v. Bradford*, 423 F.3d 1149, 1157 (10th Cir. 2012) (explaining that a series of otherwise innocent factors may be sufficient, when taken together, to support a conclusion that a trooper has a particularized and objective basis for suspecting criminal activity).

[27]*See Illinois v. Caballes,* 543 U.S. 405, 409 (2005).

[28]*United States v. Cash*, 733 F.3d 1264, 1274 (10th Cir. 2013).

[29]*United States v. Chavira*, 9 F.3d 888, 890 n.1 (10th Cir. 1993).

suspicion alone to prolong the encounter for a drug canine to sniff the vehicle.

Moreover, the evidence does not support Defendants' position that Trooper Krause engaged in a coercive show of force. The video shows that Trooper Krause did not lean on the car, nor place his head inside the car window when he asked Angela for her consent to wait for a drug canine. Trooper Krause also testified that he did not place his head inside the vehicle at any point, because such a gesture would expose him to safety risks. And this Court concludes that without any coercive show of force, and with an equivocal consent by Angela– to wait on the drug dog– but not to consent to Krause' search– the detention for twenty minutes to await the arrival of a drug dog was reasonable.[30]

### F. CANINE SNIFF

Defendants argue that the canine sniff was invalid because Officer Head directed Rex into the car and Rex failed to alert prior to entering the car. But the Tenth Circuit has upheld as valid, a search in which a dog instinctively enters a vehicle, without the direction, assistance or encouragement of his police handler.[31] The video shows Trooper Krause and Officer Head standing at the back of the vehicle. Neither officer signaled to Rex nor opened the doors or windows of the car for Rex to enter. The passenger side window had been left open by the two women. When Officer Krause gave Rex the command to perform the sniff he was standing approximately eight feet away. The video recording shows that Rex began his search and entered the car's open passenger side window without any direction or assistance from Officer Head. Only when Rex had entered the vehicle did Officer Head walk up to the car and peer

---

[30] *See United States v. Mendoza,* 468 F.3d 1256, 1261 (10th Cir. 2006) (extended detention of forty minutes waiting for a drug-sniffing dog was reasonable).

[31] *See United States v. Stone*, 866 F.2d 359, 364 (10th Cir. 1989).

13

inside, to ascertain Rex's safety and to determine whether Rex had further alerted or indicated. Officer Head never entered the vehicle with Rex while he was searching. While Rex did not indicate on the exterior of the vehicle, Rex alerted prior to entering the car and indicated in the backseat where Adrienne's purse was located. Moreover, the fact that Officer Head walked around the car with Rex a second time is immaterial because Rex had already alerted and indicated during the first search, which he conducted independently. Accordingly, the Court finds that the canine search was valid.

### G. PROBABLE CAUSE TO SEARCH CONTENTS OF THE VEHICLE

Defendants object to the subsequent search of the vehicle, arguing that the "plain view" and "search-incident-to-arrest" doctrines do not apply. But the Government does not invoke either of these doctrines. The Court finds that this search was a proper "warrantless search of an automobile.... justified by the vehicle's inherent mobility and the diminished expectation of privacy which surrounds the automobile."[32] "Under the automobile exception to the Fourth Amendment's warrant requirement, 'police officers who have probable cause to believe there is contraband inside an automobile that has been stopped on the road may search it without obtaining a warrant.'"[33] "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence."[34]

---

[32]*United States v. Arzaga*, 9 F.3d 91, 94 (10th Cir. 1993) (citing *United States v. Chadwick*, 433 U.S. 1, 12 (1977)); *see United States v. Beckstead*, 500 F.3d 1154, 1165 (10th Cir. 2007) ("Although the automobile exception is based in part on exigency, 'the justification to conduct such a warrantless search does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant.'" (citations omitted)).

[33]*United States v. Vazquez*, 555 F.3d 923, 930 (10th Cir. 2009) (quoting *Florida v. Meyers*, 466 U.S. 380, 381 (1984)).

[34]*United States v. Chavez*, 534 F.3d 1338, 1344 (10th Cir. 2008).

Here, the officers had probable cause based on the canine search alone. A a drug dog's alert to the presence of drugs is independently sufficient to establish probable cause to search the entire car, including the trunk.[35]

### H. FRUIT OF THE POISONOUS TREE

Because the Court finds that the stop and search were proper, the Court denies Defendants' motion to suppress any statements made by them on or after their detention and search of the vehicle. These statements were not fruit of the poisonous tree.[36]

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant Adrienne Lopez's Motion to Suppress Evidence Regarding Car Stop, Drug Dog Search, and Statements (Doc. 74) and Defendant Angela Marie Lopez's Motion to Suppress Evidence (Doc. 70) are DENIED.

Dated: March 18, 2014

                                          S/ Julie A. Robinson

                                          JULIE A. ROBINSON

                                          UNITED STATES DISTRICT JUDGE

---

[35] *United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir. 2009); *United States v. Stewart*, 473 F.3d 1265, 1270 (10th Cir. 2007).

[36] *See, e.g., United States v. Maio*, 182 F. Supp. 2d 1025, 1035 (D. Kan. 2001).